1  LAWYERS FOR CLEAN WATER, INC.
2  Layne Friedrich (Bar No.  195431)
        Email:  layne@lawyersforcleanwater.com
3  Drevet Hunt (Bar No. 240487)
        Email: drev@lawyersforcleanwater.com
4  1004-A O'Reilly Avenue
5  San Francisco, California 94129
6  Telephone:  (415) 440-6520
   Facsimile:  (415) 440-4155
7

8  *Attorneys for Plaintiff*
   CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
9

10

11  **UNITED STATES DISTRICT COURT**
    **EASTERN DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| 13 CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a California non-profit corporation, | Civil Case No. |
| 14 | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| 15 Plaintiff, | |
| 16 vs. | |
| 17 PICK-N-PULL AUTO DISMANTLERS, a California general partnership; NORPROP, INC., a California corporation; PICK AND PULL AUTO DISMANTLING, INC., a California corporation; SCHNITZER STEEL INDUSTRIES, INC., an Oregon corporation; | **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |
| 23 Defendants. | |

24

25

26

27

28

Complaint

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On March 24, 2014, CSPA sent a sixty (60) day notice of intent to sue ("Notice Letter") to Pick-N-Pull Auto Dismantlers; Norprop, Inc.; Pick and Pull Auto Dismantling, Inc.; and Schnitzer Steel Industries, Inc. (collectively "Defendants"). The Notice Letter informed Defendants of their violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act. The Notice Letter also informed Defendants of CSPA's intent to file suit against them to enforce the Storm Water Permit and the Clean Water Act.

3.      The Notice Letter was sent to the registered agents for Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit 1 and is incorporated herein by reference.

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendants and the state and federal agencies. Plaintiff is informed and believes, and

thereon alleges, that neither EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.     Defendants' violations of the procedural and substantive requirements of the Storm Water Permit and the Clean Water Act alleged in this Complaint are ongoing and continuous.

## II.     INTRODUCTION

7.     This Complaint seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at 6355 Pacific Street, in Rocklin, California 95677 ("PNP Rocklin Facility" or "Facility"), including Defendants' discharges of polluted storm water from the Facility.[1]

8.     With every storm event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the PNP Rocklin Facility, pour into Placer County area waters. The consensus among water quality agencies and specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. Placer County area waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Placer County area waters have for people in the surrounding communities. The public's use of Placer County area waters for water contact sports

---

[1] The PNP Rocklin Facility is described in Section V below, and in the Notice Letter attached hereto as Exhibit 1.

Complaint                                     3

exposes many people to toxic metals and other contaminants in storm water. Non-contact recreation and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges into Placer County area waters.

## III.    PARTIES

### A.    California Sportfishing Protection Alliance.

9.     Founded in 1983, CSPA is a non-profit public benefit conservation and research organization formed under section 501(c)(3) of the Internal Revenue Code, and located at 3536 Rainier Avenue, Stockton, California 95204.

10.    CSPA's mission is to conserve, restore, and enhance the state's water quality, wildlife, fishery resources, aquatic ecosystems, and associated riparian habitats.

11.    To further this mission, CSPA actively seeks federal, state, and local agency implementation of environmental regulations and statutes and routinely participates in administrative, legislative, and judicial proceedings. When necessary, CSPA directly initiates enforcement actions on behalf of itself and its members.

12.    Defendants discharge polluted storm water into Dry Creek, which flows to Steelhead Creek, then the Natomas East Main Drainage, which discharges to the Sacramento River (collectively "the Receiving Waters").

13.    CSPA has approximately 2,000 members who live, use, enjoy, and/or recreate in and around the Receiving Waters. CSPA's members use and enjoy the Receiving Waters for fishing, boating, swimming, diving, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, monitoring the watershed, and/or conducting watershed restoration.

14.    Discharges of polluted storm water from the PNP Rocklin Facility degrade water quality, harm aquatic life in the Receiving Waters, and impair CSPA's members' use and enjoyment of the Receiving Waters.

15.    Defendants' polluted discharges from the PNP Rocklin Facility are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water

Act and the Storm Water Permit.

**B.    The PNP Rocklin Facility Owners and/or Operators.**

    1.    <u>Pick and Pull Auto Dismantling, Inc.</u>

16.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto Dismantling, Inc. is a corporation formed under the laws of the State of California.

17.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto Dismantling, Inc. is an owner of the PNP Rocklin Facility.

18.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto Dismantling, Inc. has owned the PNP Rocklin Facility since at least March 28, 2009.

19.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto Dismantling, Inc. is an operator of the PNP Rocklin Facility.

20.    CSPA is informed and believes, and thereon alleges, that Pick and Pull Auto Dismantling, Inc. has operated the PNP Rocklin Facility since at least March 28, 2009.

21.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto Dismantling, Inc. is one of the general partners of the Pick-N-Pull Auto Dismantlers general partnership.

22.    CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for Pick and Pull Auto Dismantling, Inc. is CT Corporation System at 818 W Seventh Street, Los Angeles, California 90017.

    2.    <u>Schnitzer Steel Industries, Inc.</u>

23.    CSPA is informed and believes, and thereon alleges, that Schnitzer Steel Industries, Inc. is a corporation formed under the laws of the State of Oregon, and registered in the State of California.

24.    CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility is just one of approximately sixty-five (65) Pick and Pull locations across the United States and Canada.

25.    CSPA is informed and believes, and thereon alleges, that all of the Pick and Pull locations were acquired by Schnitzer Steel Industries, Inc. in or around 2003, and

Pick and Pull Auto Dismantling, Inc. became a fully owned subsidiary of Schnitzer Steel Industries, Inc.'s "Auto Parts Business unit."

26.   CSPA is informed and believes, and thereon alleges, that Schnitzer Steel Industries, Inc. is an owner of the PNP Rocklin Facility.

27.   CSPA is informed and believes, and thereon alleges, that Schnitzer Steel Industries, Inc. has owned the PNP Rocklin Facility since at least March 28, 2009.

28.   CSPA is informed and believes, and thereon alleges, that Schnitzer Steel Industries, Inc. is an operator of the PNP Rocklin Facility.

29.   CSPA is informed and believes, and thereon alleges, that Schnitzer Steel Industries, Inc. has operated the PNP Rocklin Facility since at least March 28, 2009.

30.   CSPA is informed and believes, and thereon alleges, that the registered agent for service of process for Schnitzer Steel Industries, Inc. is CT Corporation System, located at 818 W Seventh Street, Los Angeles, California 90017.

3.   Norprop, Inc.

31.   CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is a corporation formed under the laws of the State of Oregon, and registered in the State of California.

32.   CSPA is informed and believes, and thereon alleges that Norprop Inc. is a wholly owned subsidiary of Schnitzer Steel Industries, Inc.

33.   CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is an owner of the PNP Rocklin Facility.

34.   CSPA is informed and believes, and thereon alleges, that Norprop, Inc. has owned the PNP Rocklin Facility since at least March 28, 2009.

35.   CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is an operator of the PNP Rocklin Facility.

36.   CSPA is informed and believes, and thereon alleges, that Norprop, Inc. has operated the PNP Rocklin Facility since at least March 28, 2009.

37.   CSPA is informed and believes, and thereon alleges, that Norprop, Inc. is

1   one of the general partners of the Pick-N-Pull Auto Dismantlers general partnership.

2        38.    CSPA is informed and believes, and thereon alleges, that the registered agent

3   for service of process for Norprop, Inc. is CT Corporation System at 818 W Seventh

4   Street, Los Angeles, California 90017.

5        4.   <u>Pick-N-Pull Auto Dismantlers</u>

6        39.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

7   Dismantlers is a general partnership registered in the State of California.

8        40.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

9   Dismantlers is an owner of the PNP Rocklin Facility.

10       41.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

11  Dismantlers has owned the PNP Rocklin Facility since at least March 28, 2009.

12       42.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

13  Dismantlers is an operator of the PNP Rocklin Facility.

14       43.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

15  Dismantlers has operated the PNP Rocklin Facility since at least March 28, 2009.

16       44.    CSPA is informed and believes, and thereon alleges, that Pick-N-Pull Auto

17  Dismantlers is one of the general partners of the Pick-N-Pull Auto Dismantlers general

18  partnership.

19       45.    CSPA refers to Pick-N-Pull Auto Dismantlers; Norprop, Inc.; Pick and Pull

20  Auto Dismantling, Inc.; and Schnitzer Steel Industries, Inc. collectively as the "PNP

21  Rocklin Facility Owners and/or Operators."

22  **IV.**    **LEGAL BACKGROUND**

23      **A.**    **The Clean Water Act and California's Storm Water Permit.**

24       46.    Section 301(a) of the Clean Water Act prohibits the discharge of any

25  pollutant into waters of the United States not authorized by, or in violation of, the terms

26  of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §

27  1311(a).

28       47.    Section 402(p) of the Clean Water Act establishes a framework for

regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

48.     Section 402(b) of the Clean Water Act. allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide, general NPDES permit applicable to all industrial storm water dischargers. *See id.*

49.     California is a state authorized by the EPA to issue NPDES permits.

50.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act. *See* Storm Water Permit, Finding No. 15.

51.     In order to discharge storm water lawfully in California, industrial storm water dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit.

52.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section C(1) (Standard Provisions).

53.     Waters of the United States include traditionally navigable waters, tributaries to traditionally navigable waters, wetlands, and wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. *See Rapanos v. U.S.,* 126 S. Ct. 2208 (2006).

54.     The Clean Water Act also confers jurisdiction over waters that have a significant nexus to the navigable water. *Rapanos,* 126 S. Ct. at 2248-49. A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Id.* at 2248.

55.     A significant nexus is also established for waters that have flood control properties, including functions such as the reduction of flow, pollutant trapping, and

nutrient recycling. *Id.* at 2250.

56.     Each of the Receiving Waters is a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act. *See* 33 U.S.C. § 1362(7) and 33 C.F.R. § 328.3(a).

57.     Section 505(a)(1) of the Clean Water Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

58.     Pick-N-Pull Auto Dismantlers is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

59.     Norprop, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

60.     Pick and Pull Auto Dismantling, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

61.     Schnitzer Steel Industries, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

62.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

63.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

64.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.     Effluent Limitation B(3) of the Storm Water Permit.**

65.     Effluent Limitation B(3) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activities in storm water discharges through the implementation of Best Available Technology Economically Achievable

("BAT") for toxic or non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform, among others.

66.    In states not delegated to implement the Clean Water Act, EPA regulates industrial storm water pollution with the *NPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity* ("MSGP"), which includes numeric benchmarks for pollutant concentrations in storm water discharges ("Benchmark Levels").

67.    The Benchmark Levels provide an objective standard to determine whether a facility's Best Management Practices ("BMPs") are successfully developed and/or implemented. *See* MSGP Fact Sheet, at 95 (2008), *available at* http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

68.    Discharges from an industrial facility containing pollutant concentrations that exceed Benchmark Levels indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants. *Id.*

### C.    Receiving Water Limitations C(1) and C(2) of the Storm Water Permit.

69.    Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges that adversely impact human health or the environment.

70.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

71.    Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges that "cause or contribute to an exceedance of any applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional

Board's Basin Plan."

72.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and/or the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

73.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the *Water Quality Control Plan for the Sacramento River and San Joaquin River Basins*, California Regional Water Quality Control Board, Central Valley Region (4th Ed., revised Oct. 2011) ("Basin Plan"), and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

74.     The CTR includes numeric criteria set to protect human health and the environment in the State of California.[2]

75.     The Basin Plan identifies the "Beneficial Uses" of water bodies in the Sacramento area.

76.     The Beneficial Uses for the Receiving Waters, which receive polluted storm water discharges from the PNP Rocklin Facility, collectively include agriculture supply (AGR), municipal and domestic supply (MUN), water contact recreation (REC 1), non-contact water recreation (REC 2), cold freshwater habitat (COLD), warm freshwater habitat (WARM), wildlife habitat (WILD), migration of aquatic organisms (MIGR), navigation (NAV), and spawning, reproduction, and development (SPWN). *See* Basin Plan at II-1.00 – II-8.00.

77.     A surface water that cannot support a listed Beneficial Use is designated as an impaired water body pursuant to Section 303(d) of the Clean Water Act. *See* 33 U.S.C. § 1313(d).

78.     A discharge of a pollutant at a level above an applicable WQS, such as the CTR, causes and/or contributes to the impairment of the Beneficial Uses of the waters

---

[2] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

1   receiving the discharges.

2       79.    The Natomas East Main Drainage is impaired by diazinon, mercury, and

3   PCBs.[3]

4       80.    The portion of the Sacramento River that receives discharges from the PNP

5   Rocklin Facility is impaired for chlordane, DDT, dieldrin, mercury, PCBs, and unknown

6   toxicity.

7       81.    Dry Creek is a perennial stream within the Dry Creek watershed, which is a

8   tributary to the Sacramento River.

9       82.    Dry Creek provides flood control and flood management. Dry Creek also

10  provides hydrological transport of materials, including water and any dissolved or

11  suspended pollutants, sediment, and organic matter to downstream waters, and provides

12  habitat for riparian species and aquatic dependent organisms.

13      83.    Dry Creek affects the physical, chemical, and biological integrity of

14  downstream waters, including the Natomas East Main Drainage and Sacramento River.

15      84.    Discharges with pollutant levels in excess of the CTR criteria, the Basin

16  Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of

17  the Storm Water Permit.

18      **D.    The Storm Water Permit's Storm Water Pollution Prevention Plan
             Requirements.**

19

20      85.    Section A(1) and Provision E(2) of the Storm Water Permit require

21  dischargers to develop and implement a Storm Water Pollution Prevention Plan

22  ("SWPPP") that complies with the requirements of the Storm Water Permit prior to

23  commencing industrial activities.

24      86.    The objectives of the SWPPP are to identify and evaluate sources of

25  pollutants associated with industrial activities that may affect the quality of storm water

26  discharges, to identify and implement site-specific BMPs to prevent the exposure of

27  ─────────────────
    [3] 2010 Integrated Report – All Assessed Waters, available at:

28  http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last
    accessed on May 14, 2014).

pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

87.   Section A(3) of the Storm Water Permit requires a discharger to identify the members of its on-site Storm Water Pollution Prevention Team and to indicate each team member's responsibilities in developing, implementing, and revising the SWPPP as to ensure compliance with the Storm Water Permit.

88.   Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains, among other requirements: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance, and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

89.   Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

90.   Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water.

91.   Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

92.   Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to

determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water Permit requires that the SWPPP include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges.

93. Section A(8) of the Storm Water Permit requires that the SWPPP include a narrative description of the storm water BMPs to be implemented at the facility for each potential pollutant and its source. BMPs shall be developed and implemented to reduce or prevent pollutants in storm water discharges. *Id.* Dischargers must develop and implement structural and/or non-structural BMPs. *Id.*

94. Section A(9) of the Storm Water Permit requires that the discharger evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit.

95. Sections A(9)(a)-(c) of the Storm Water Permit require that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP.

96. Section A(9)(d) of the Storm Water Permit requires that the discharger submit an evaluation report that includes identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and certification that the discharger is in compliance with the Storm Water Permit. If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit.

Complaint                                                    14

Storm Water Permit, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report, which is specified in Section B(14) of the Storm Water Permit. Storm Water Permit, Section B(14).

97.   Section A(10) of the Storm Water Permit requires that the discharger revise the SWPPP as necessary prior to changes in industrial activities, or as otherwise required by the Storm Water Permit.

**E.   The Storm Water Permit's Monitoring and Reporting Requirements.**

98.   Section B(1) and Provision E(3) of the Storm Water Permit require dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") prior to commencing industrial activities.

99.   The objectives of the M&RP are to confirm that BMPs have been adequately developed and implemented such that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

100.   The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit, Sections B(2)(c) and B(2)(d).

101.   Section B(2)(d) of the Storm Water Permit requires that the M&RP "shall be revised" as necessary to ensure compliance with the Storm Water Permit.

102.   Section B(3) of the Storm Water Permit requires a discharger to conduct visual observations of all drainage areas within the facility for the presence of authorized and unauthorized non-storm water discharges. Observations under this section must occur during daylight hours, on days with no storm water discharges, and during scheduled facility operating hours.

103.   Section B(4) of the Storm Water Permit requires a discharger to conduct visual observations of storm water discharges during the first hour of discharge, at each discharge point, of at least one storm event per month during the Wet Season (October 1 – May 30). Observations under this section must take place during daylight hours, on

1   days when the discharge is preceded by at least three (3) days without storm water

2   discharges, and during scheduled facility operating hours.

3       104.   Visual observations conducted under Sections B(3) and B(4) of the Storm

4   Water Permit must be recorded. Records of observations must describe the presence of

5   any floating or suspended materials, O&G, discolorations, turbidity, odor, and the source

6   of any pollutants observed during the visual observation. Dischargers must maintain

7   records of visual observations that include the observation date, locations observed, and

8   responses taken to eliminate unauthorized non-storm water discharges and to reduce or

9   prevent pollutants from contacting non-storm water and storm water discharges.

10   Furthermore, Sections B(3) and B(4) require a discharger to revise a facility's SWPPP in

11   order to rectify any instances of noncompliance observed during visual observations.

12       105.   Sections B(5) and B(7) of the Storm Water Permit require dischargers to

13   visually observe and collect samples of storm water discharges from all locations where

14   storm water is discharged.

15       106.   Section B(5)(a) of the Storm Water Permit requires dischargers to collect

16   storm water samples during the first hour of discharge. Samples of storm water

17   discharges must be collected from the first storm event of the Wet Season and at least one

18   other storm event in the Wet Season. *Id.* All storm water discharge locations must be

19   sampled. *Id*.

20       107.   Facility operators that do not collect samples from the first storm event of

21   the Wet Season are still required to collect samples from two other storm events during

22   the Wet Season, and must explain in the Annual Report why the first storm event was not

23   sampled. *Id.*

24       108.   Section B(5)(b) requires that sampling conducted pursuant to the Storm

25   Water Permit occur during scheduled facility operating hours on days that are preceded

26   by at least three (3) working days without storm water discharge.

27       109.   Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze

28   each sample for pH, specific conductance ("SC"), TSS, and O&G. A discharger may

Complaint                        16

1   substitute analysis for total organic carbon ("TOC") instead of O&G.

2       110.   Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to

3   analyze each storm water sample for toxic chemicals and other pollutants likely to be

4   present in the storm water discharged from the facility in significant quantities.

5       111.   Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities

6   classified as Sector M (Standard Industrial Classification ("SIC") Code 5015) to analyze

7   storm water samples for iron, lead, and aluminum, and as otherwise required by the

8   Regional Board.

9       112.   Section B(14) of the Storm Water Permit requires dischargers to submit an

10  Annual Report to the applicable regional board by July 1 of each year. The Annual

11  Report must include a summary of visual observations and sampling results, an

12  evaluation of the visual observations and sampling and analysis results, laboratory

13  reports, the annual comprehensive site compliance evaluation report specified in Section

14  A(9) of the Storm Water Permit, an explanation of why a facility did not implement any

15  required activities, and other records specified in Section B(13) of the Storm Water

16  Permit.

17      113.   Section C(9) of the Storm Water Permit requires that all reports,

18  certifications, or other information required by the Storm Water Permit or requested by a

19  regional board to have been signed by an authorized representative of the facility's

20  operators.

21      114.   Section C(11)(d) of the Storm Water Permit requires facility operators to

22  report any incidence of noncompliance with the Storm Water Permit at the time

23  monitoring reports are submitted. Reports of noncompliance must contain (1) a

24  description of noncompliance and its cause, (2) the period of noncompliance, including

25  exact dates and times, and if the noncompliance has not been corrected, the anticipated

26  time it is expected to continue, and (3) steps taken or planned to reduce and prevent

27  recurrence of the noncompliance.

28  / / /

Complaint                    17

# V.      FACTUAL BACKGROUND

## A.      The PNP Rocklin Facility's Storm Water Permit Coverage.

115.   On March 30, 1991, Pick-N-Pull Auto Dismantlers submitted a Notice of Intent ("NOI") to comply with the Storm Water Permit ("1991 NOI") for the PNP Rocklin Facility.

116.   The State Board confirmed receipt of the 1991 NOI on April 6, 1992 ("1991 NOI Receipt").

117.   On June 23, 1995, Pick-N-Pull Auto Dismantlers submitted a revised NOI ("1995 NOI"). The 1995 NOI changed the contact information and address for the Facility operator to the Sacramento Pick-N-Pull Auto Dismantler facility located at 7590 Stockton Boulevard.

118.   On June 16, 1997, Pick-N-Pull Auto Dismantlers submitted an NOI ("1997 NOI"). The 1997 NOI updated the Facility's contact persona and phone number.

119.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current PNP Rocklin Facility Waste Discharge Identification ("WDID") number as 5S31I004286.

120.   SMARTS lists the PNP Rocklin Facility, WDID 5S31I004286, as having "active" coverage under the Storm Water Permit.

121.   The 1992 NOI, 1995 NOI, and 1997 NOI list the SIC code for the Facility as 5015 (Motor Vehicle Parts, Used).

## B.      Industrial Activities at the PNP Rocklin Facility.

122.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility is approximately six (6) acres in size.

123.   CSPA is informed and believes, and thereon alleges, that the following industrial activities are conducted at the PNP Rocklin Facility: automobile dismantling; automobile parts storage and resale; used and salvaged automobile storage; scrap metal processing, storage, and sale; used battery collection, storage, and recycling; and vehicle and equipment maintenance and repair.

124.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility generates, handles, and stores hazardous wastes, including waste oil, coolant, antifreeze, and gasoline.

125.   CSPA is informed and believes, and thereon alleges, that industrial operations areas at the Facility are sources of pollutants and include, but may not be limited to: outdoor material handling and storage areas; automobile dismantling and crushing areas; used and salvaged automobile and parts storage areas; scrap metal processing and storage areas; used battery collection, storage, and recycling areas; vehicle and equipment maintenance and/or activities and areas; vehicle and equipment cleaning activities and areas; hazardous waste storage areas; parking areas; loading and unloading areas; areas with truck traffic and associated track-off of pollutants; material processing areas; loose piles of scrap materials; waste dumpsters; and on-site material handling equipment.

126.   CSPA is informed and believes, and thereon alleges, that the pollutants associated with operations at the PNP Rocklin Facility include, but are not limited to: sediment; dust and particulates; petroleum hydrocarbons; coolant; used oil filters; waste antifreeze; used oil; sulfuric acid; solvents; hydraulic fluids; diesel fuel; motor oil; and heavy metals such as mercury, zinc, copper, iron, aluminum, and lead.

127.   CSPA is informed and believes, and thereon alleges, that industrial activities at the PNP Rocklin Facility are conducted outdoors and without adequate cover or other BMPs to prevent the exposure of industrial activities to rainfall.

128.   CSPA is informed and believes, and thereon alleges, that there is inadequate secondary containment at the Facility, and inadequate measures to prevent polluted storm water from discharging from the Facility.

129.   CSPA is informed and believes, and thereon alleges, that materials associated with industrial activities are stored near driveways and other discharge points at the PNP Rocklin Facility.

130.   CSPA is informed and believes, and thereon alleges, that O&G, trash,

Complaint                                    19

debris, and other pollutants, including heavy metals, have been and continue to be tracked throughout the PNP Rocklin Facility.

131.   CSPA is informed and believes, and thereon alleges, that pollutants accumulate at outdoor material handling and storage areas; material processing areas; vehicle and equipment maintenance, storage, and cleaning areas; hazardous waste storage areas; parking lots and driveways leading to Pacific Street; loading and unloading areas; dumpsters; and the surrounding municipal streets themselves.

132.   CSPA is informed and believes, and thereon alleges, that trucks and vehicles coming into and leaving the PNP Rocklin Facility via staging areas and driveways are pollutant sources tracking sediment, dirt and dust, O&G, and other pollutants off-site.

133.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs to prevent the exposure of pollutants and their sources to storm water flows at the PNP Rocklin Facility, in violation of the Storm Water Permit and the Clean Water Act.

134.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators have failed to adequately develop and/or implement BMPs sufficient to reduce or prevent pollutants in storm water discharged from the PNP Rocklin Facility, as required by the Storm Water Permit and the Clean Water Act.

135.   The failure to properly develop and implement BMPs for pollutants and their sources results in the discharge of pollutants from the PNP Rocklin Facility in violation of the Storm Water Permit and the Clean Water Act.

**C.   Storm Water Discharges at the PNP Rocklin Facility.**

136.   CSPA is informed and believes, and thereon alleges, that there are at least seven (7) discharge points at the PNP Rocklin Facility. CSPA refers to these discharge points as Discharge Points #1 – 7.

137.   CSPA is informed and believes, and thereon alleges, that Discharge Point #1 is a drop inlet drain that is located in a gravel production east of the Sales Building.

138.   CSPA is informed and believes, and thereon alleges, that Discharge Point #2

is a drop inlet drain that is located south of the southern boundary of the Facility by the De-Garbage Area.

139.   CSPA is informed and believes, and thereon alleges, that Discharge Point #3 is a drop inlet drain that is located at the southern end of the paved parking area where customers park and perform car repairs.

140.   CSPA is informed and believes, and thereon alleges, that Discharge Point #4 is a drop inlet drain that is located in the paved parking area south of Discharge Point #3 where wrecked and dismantled vehicles are received and shipped.

141.   CSPA is informed and believes, and thereon alleges, that Discharge Point #5 is a drop inlet drain that is located in the southwestern corner of the PNP Rocklin Facility near Pacific Street.

142.   CSPA is informed and believes, and thereon alleges, that Discharge Point #6 is a driveway located on the northwestern edge of the Facility leading to Pacific Street.

143.   CSPA is informed and believes, and thereon alleges, that Discharge Point #7 is a driveway located on the southwestern edge of the Facility leading to Pacific Street.

144.   CSPA is informed and believes, and thereon alleges, that Discharge Points #1 – 7 flow to the Receiving Waters.

**D.     The Storm Water Discharges at the PNP Rocklin Facility Contain Elevated Levels of Pollutants.**

145.   Samples of storm water discharges collected at the PNP Rocklin Facility contain levels of pollutants in excess of Benchmark Levels. *See* Exhibit 1 at § II.A; Exhibit 2 (identifying specific storm water samples with lead, zinc, oil and grease, copper, total suspended solids, cadmium, and electrical conductivity concentrations above Benchmark Levels).

146.   CSPA is informed and believes, and thereon alleges, that repeated exceedances of Benchmark Levels demonstrate that Defendants failed and continue to fail to develop and/or implement BMPs at the Facility that achieve compliance with BAT/BCT standards.

147.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur each time storm water discharges from the PNP Rocklin Facility.

148.   Samples of storm water discharges collected at the PNP Rocklin Facility contain levels of pollutants in excess of WQS. *See* Exhibit 1 § II.B; Exhibit 2 (identifying specific storm water samples with lead, zinc, copper, electrical conductivity, and cadmium concentrations above WQS).

149.   Samples of storm water discharges collected at the PNP Rocklin Facility contain concentrations of pollutants at levels known to adversely impact aquatic species and the environment. *See* Exhibit 1 at § II.B.

**E.     Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements.**

150.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators failed and continue to fail to develop a SWPPP for the PNP Rocklin Facility that complies with Section A of the Storm Water Permit.

151.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators failed and continue to fail to implement a SWPPP for the PNP Rocklin Facility that complies with Section A of the Storm Water Permit.

152.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators failed and continue to fail to revise the SWPPP for the PNP Rocklin Facility as necessary to ensure compliance with the Storm Water Permit.

153.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility SWPPP does not contain a site map that includes all of the information required by Section A(4) of the Storm Water Permit, such as, structural control measures that affect storm water discharges; locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred; or areas of industrial activity, including areas that are actual and potential pollutant sources.

154.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin

Facility SWPPP does not include, among other things, an adequate description of the Facility's potential pollutant sources and potential pollutants that could be discharged in storm water, as required by Section A(6) of the Storm Water Permit.

155.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility SWPPP does not include, among other things, the required analysis and evaluation to determine what areas of the Facility are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges, as required by Section A(7) of the Storm Water Permit.

156.   The PNP Rocklin Facility SWPPP does not include adequate BMPs to reduce or prevent pollutants in storm water discharges to levels required by the Storm Water Permit.

**F.     Defendants' Failure to Comply with the Storm Water Permit's M&RP Requirements.**

157.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators failed and continue to fail to develop an adequate M&RP for industrial operations at the PNP Rocklin Facility that complies with Section B of the Storm Water Permit.

158.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators failed and continue to fail to implement an adequate M&RP for industrial operations at the PNP Rocklin Facility that complies with Section B of the Storm Water Permit.

159.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators failed and continue to fail to revise the M&RP for the PNP Rocklin Facility as required by the Storm Water Permit.

160.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to conduct observations of unauthorized non-storm water discharges as required by Section B(3) of the Storm Water Permit

161.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin

Facility Owners and/or Operators fail to conduct observations of authorized non-storm water discharges as required by Section B(3) of the Storm Water Permit

162. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to conduct visual observations of storm water discharges as required by Section B(4) of the Storm Water Permit.

163. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to collect a storm water sample from the first storm event of each Wet Season and do not provide an explanation for this failure, as required by Section B(5) of the Storm Water Permit.

164. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to collect storm water samples during the first hour of discharge, as required by Section B(5) of the Storm Water Permit.

165. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to collect storm water samples from all discharge locations at the PNP Rocklin Facility, as required by Section B(5) of the Storm Water Permit.

166. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to analyze each storm water sample for all pollutants required by Table D of the Storm Water Permit for facilities classified as SIC Code 5015, as required by Section B(5) of the Storm Water Permit.

167. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to analyze storm water samples for all pollutants likely to be present in the Facility's discharges in significant quantities, as required by Section B(5) of the Storm Water Permit.

**G.   Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements.**

168. CSPA is informed and believes, and thereon alleges, that the PNP Rocklin Facility Owners and/or Operators fail to include the required Annual Comprehensive Site

1  Compliance Evaluation Report in Annual Reports, as required by Section A(9) and B(14)
2  of the Storm Water Permit.

3      169.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin
4  Facility Owners and/or Operators fail to explain their noncompliance with the Storm
5  Water Permit in Annual Reports, as required by Section A(9)(d) of the Storm Water
6  Permit.

7      170.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin
8  Facility Owners and/or Operators fail to include an evaluation report that explains
9  necessary SWPPP revisions and a schedule for implementing the SWPPP revisions in
10 Annual Reports, as required by Section A(9)(d) of the Storm Water Permit.

11     171.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin
12 Facility Owners' and/or Operators' certifications of compliance, made in accordance with
13 Section A(9)(d) of the Storm Water Permit in each of the Facility's past five (5) Annual
14 Reports, are erroneous.

15     172.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin
16 Facility Owners and/or Operators have failed and continue to fail to submit complete and
17 adequate Annual Reports that comply with Section B(14) of the Storm Water Permit.

18     173.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin
19 Facility Owners and/or Operators fail to include a summary or evaluation of their visual
20 observations and sampling results in Annual Reports, as required by Section B(14) of the
21 Storm Water Permit.

22     174.   CSPA is informed and believes, and thereon alleges, that the PNP Rocklin
23 Facility Owners and/or Operators fail to provide the documentation required by Section
24 B(7)(d) of the Storm Water Permit in their Annual Reports to support their determination
25 that they may analyze combined samples.

26 / / /
27 / / /
28 / / /

Complaint                              25

# VI.    CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitation B(3) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

175.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

176.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent levels of pollutants in the Facility's storm water discharges through development and implementation of BAT/BCT.

177.   CSPA is informed and believes, and thereon alleges, that Defendant's violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act occur each time storm water is discharged from the Facility.

178.   CSPA is informed and believes, and thereon alleges, that Defendants violate Effluent Limitation B(3) of the Storm Water Permit each and every time storm water discharges from the PNP Rocklin Facility without the development and implementation of BMPs that achieve BAT/BCT.

179.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Effluent Limitation B(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

180.   Defendants will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time storm water discharges from the PNP Rocklin Facility in violation of Effluent Limitation B(3) of the Storm Water Permit.

181.   Each and every violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

182.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged

above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 28, 2009.

183.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(1) and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

184.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

185.   CSPA is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that adversely impact human health and/or the environment.

186.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the PNP Rocklin Facility occur each time storm water discharges from the PNP Rocklin Facility.

187.   CSPA is informed and believes, and thereon alleges, that Defendants violate Receiving Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharges from the PNP Rocklin Facility.

188.   CSPA is informed and believes, and thereon alleges, that Defendants' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

189.   Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the PNP Rocklin Facility in violation of Receiving Water Limitation C(1) of the Storm Water Permit.

190.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

191.   Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 28, 2009.

192.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitation C(2) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

193.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

194.   CSPA is informed and believes, and thereon alleges, that Defendants have discharged and continue to discharge storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of water quality standards.

195.   CSPA is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of water

1   quality standards occur each time storm water discharges from the PNP Rocklin Facility.

2       196.   CSPA is informed and believes, and thereon alleges, that Defendants violate

3   Receiving Water Limitation C(2) of the Storm Water Permit each and every time storm

4   water containing levels of pollutants that cause or contribute to exceedances of water

5   quality standards discharges from the PNP Rocklin Facility.

6       197.   CSPA is informed and believes, and thereon alleges, that Defendants'

7   violations of Receiving Water Limitation C(2) of the Storm Water Permit and Clean

8   Water Act are ongoing and continuous.

9       198.   Defendants will continue to be in violation of the Storm Water Permit and

10   the CWA each and every time contaminated storm water discharges from the PNP

11   Rocklin Facility in violation of Receiving Water Limitation C(2) of the Storm Water

12   Permit.

13       199.   Each and every violation of Receiving Water Limitation C(2) of the Storm

14   Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C.

15   § 1311(a).

16       200.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§

17   1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged

18   above, Defendants are subject to an assessment of civil penalties for each and every

19   violation of the Clean Water Act since March 28, 2009.

20       201.   An action for injunctive relief under the Clean Water Act is authorized by 33

21   U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

22   irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or

23   adequate remedy at law.

24       WHEREFORE, CSPA prays for judgment against Defendants as set forth

25   hereafter.

26   / / /

27   / / /

28   / / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

202.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

203.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately develop a SWPPP for the PNP Rocklin Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

204.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement a SWPPP for the PNP Rocklin Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

205.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise a SWPPP for the PNP Rocklin Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

206.   Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit for failing to develop, implement, and/or revise an adequate SWPPP for the PNP Rocklin Facility every day since at least March 28, 2009.

207.   Defendants' violations of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

208.   Defendants will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act each and every day Defendants fail to adequately develop, implement, and/or revise the SWPPP for the PNP Rocklin Facility.

209.   Each and every violation of the Storm Water Permit's SWPPP requirements at the PNP Rocklin Facility is a separate and distinct violation of the Clean Water Act.

210.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged

Complaint                                     30

above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 28, 2009.

211.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

212.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

213.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately develop an M&RP for the PNP Rocklin Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

214.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately implement an M&RP for the PNP Rocklin Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

215.   CSPA is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise an M&RP for the PNP Rocklin Facility, in violation of Section B and Provision E(3) of the Storm Water Permit.

216.   Defendants have been in violation of Section B and Provision E(3) of the Storm Water Permit for their failure to develop, implement, and/or revise an adequate M&RP for the PNP Rocklin Facility every day since at least March 28, 2009.

217.   Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

218.   Defendants will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the Clean Water Act each and every day Defendants fail to adequately develop, implement, and/or revise an M&RP for the PNP Rocklin Facility.

219.   Each and every violation of the Storm Water Permit's M&RP requirements at the PNP Rocklin Facility is a separate and distinct violation of the Clean Water Act.

220.   Pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act since March 28, 2009.

221.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Defendants' Failure to Comply With the Reporting Requirements in Violation of the Storm Water Permit and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

222.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

223.   CSPA is informed and believes, and thereon alleges, that Defendants' Annual Reports have not met the reporting requirements of the Storm Water Permit, in violation of Section B(14) of the Storm Water Permit.

224.   CSPA is informed and believes, and thereon alleges, that Defendants' Annual Reports are inaccurate, in violation of Sections A(9) and B(14) of the Storm Water Permit.

225.   CSPA is informed and believes, and thereon alleges, that Defendants'

Annual Reports are incomplete, in violation of Sections A(9) and B(14) of the Storm Water Permit.

226.  Defendants have been in violation of the reporting requirements of the Storm Water Permit for failing to report as required as required by Sections A(9) and B(14) of the Storm Water Permit every day since at least March 28, 2009.

227.  Defendants' violations of the reporting requirements of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

228.  Defendants will continue to be in violation of A(9) and B(14) of the Storm Water Permit and the Clean Water Act each and every day Defendants fail to report as required by the Storm Water Permit.

229.  Each and every violation of the Storm Water Permit's reporting requirements at the PNP Rocklin Facility is a separate and distinct violation of the Clean Water Act.

230.  Pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4, by committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA since March 28, 2009.

231.  An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA and its members, for which harm CSPA has no plain, speedy, or adequate remedy at law.

WHEREFORE, CSPA prays for judgment against Defendants as set forth hereafter.

## VII.  RELIEF REQUESTED

232.  CSPA respectfully requests that this Court grant the following relief:

a.  A Court order declaring Defendants to have violated and to be in violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their violations of the substantive and procedural requirements of the Storm

1   Water Permit;

2            b.     A Court order enjoining Defendants from violating the substantive

3   and procedural requirements of the Storm Water Permit and the Clean Water Act;

4            c.     A Court order assessing civil monetary penalties for each violation of

5   the Clean Water Act at $37,500 per day per violation for violations occurring since

6   March 28, 2009, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

7            d.     A Court order awarding CSPA its reasonable costs of this suit,

8   including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of

9   the Clean Water Act, 33 U.S.C. § 1365(d);

10            e.     Any other relief as this Court may deem appropriate.

11

12   Dated: May 27, 2014                    Respectfully submitted,

13                                    LAWYERS FOR CLEAN WATER, INC.

14

15

16                                    _____

17                                    Layne Friedrich

18                                    Drevet Hunt

                                 Attorneys for Plaintiff

19                                    California Sportfishing Protection Alliance

20

21

22

23

24

25

26

27

28