1   Layne Friedrich (Bar No. 195431)
       Layne@lawyersforcleanwater.com
2   Drevet Hunt (Bar No. 240487)
       Drev@lawyersforcleanwater.com
3   LAWYERS FOR CLEAN WATER, INC.
    1004-A O'Reilly Avenue
4   San Francisco, California 94129
    Telephone: (415) 440-6520
5   Facsimile: (415) 440-4155
6
    *Attorneys for Plaintiff*
7   CALIFORNIA SPORTFISHING
    PROTECTION ALLIANCE
8
9
10
11
12                    UNITED STATES DISTRICT COURT
13                  EASTERN DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, | Civil Case No.: 2:14-cv-01284-GEB-DAD |
| Plaintiff, | **[PROPOSED] CONSENT DECREE** |
| v. | |
| PICK-N-PULL AUTO DISMANTLERS, *et al*. | **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |
| Defendants. | |

## CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff California Sportfishing Protection Alliance ("Plaintiff" or "CSPA"), and Defendants Pick-N-Pull Auto Dismantlers, a California general partnership, Pick and Pull Auto Dismantling, Inc., and Norprop, Inc. (collectively "Defendants" or "PNP"). The entities entering into this Consent Decree are each an individual "Settling Party" and collectively "Settling Parties."

**WHEREAS**, CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and restoration of the environment, the wildlife and the natural resources of all waters of California, including the Sacramento River, the American River, and the Sacramento-San Joaquin River Delta;

**WHEREAS**, Plaintiff alleges that Pick and Pull Auto Dismantling, Inc., Schnitzer Steel Industries, Inc., Auto Parts Group, Norprop Inc., and Pick-N-Pull Auto Dismantlers are each an owner and/or operator of the automobile dismantling and used auto parts facility located at 6355 Pacific Street Rocklin, California, 95677 (hereinafter the "Facility"). As long as Defendants implement the BMPs identified in Paragraph 14 hereof, and no industrial activity occurs in the Customer Parking Lot, the Customer Parking Lot shall not be considered part of the Facility;

**WHEREAS**, Defendants aver that Pick-N-Pull Auto Dismantlers is the owner and operator of the Facility, and is responsible for compliance with the requirements of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or "CWA") at the Facility;

**WHEREAS**, the general partners of Pick-N-Pull Auto Dismantlers are Pick and Pull Auto Dismantling, Inc. and Norprop, Inc.;

**WHEREAS**, Schnitzer Steel Industries, Inc. is the parent corporation of Pick and Pull Auto Dismantling, Inc., Norprop Inc., and Pick-N-Pull Auto Dismantlers;

**WHEREAS**, Defendants' operations involve the de-pollution and recycling of end-of-life vehicles, thus contributing to protection of the environment and conservation of natural resources;

**WHEREAS**, storm water at the Facility discharges from one outfall into the municipal separate storm sewer system operated by the City of Rocklin ("MS4");

**WHEREAS**, Plaintiff contends that operations at the Facility result in discharges of pollutants into Facility storm drains, and that those storm drains discharge to surface waters, including Antelope Creek, which are tributaries to the Sacramento River;

**WHEREAS,** discharges from the Facility are currently regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Storm Water Permit") and the Clean Water Act;

**WHEREAS**, as of July 1, 2015, storm water discharges from the Facility will be regulated by NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 2014-0057-DWQ ("New Storm Water Permit");

**WHEREAS**, Defendants are participants in the California Auto Dismantlers Group ("CADG") Monitoring Program under the Storm Water Permit;

**WHEREAS**, on March 21, 2014, Plaintiff sent Pick-N-Pull Auto Dismantlers, Pick and Pull Auto Dismantling, Inc., Norprop, Inc. and Schnitzer Steel Industries, Inc. a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the CWA, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342, and violations of the Storm Water Permit. A copy of the Notice Letter was sent to the United States Environmental Protection Agency ("EPA") Region IX, the State Water Resources Control Board ("State Board") and the Central Valley Regional Water Quality Control Board ("Regional Board");

**WHEREAS**, on May 23, 2014, PNP submitted a detailed response to the Notice Letter to Plaintiff, setting forth defenses to many of the alleged violations and describing the steps it had undertaken to correct other alleged violations. Among other things, PNP's response described the structural and non-structural Best Management Practices ("BMPs") employed by the Facility as part of its Storm Water Pollution Prevention Plan ("SWPPP") to reduce or prevent pollutants in storm water discharges;

**WHEREAS**, storm water discharged by the Facility flows through Jensen storm water interceptors, oil-water separators, and then is treated by a StormwateRx Clara 40C (a 5,000 gallon capacity four-stage clarifier) and by a StormwateRx Aquip 110SBI treatment system prior to discharge

1  to the MS4;

2       **WHEREAS**, Defendants allege that the StormwateRx Clara 40C was installed at the Facility in

3  March 2011 and the StormwateRx Aquip 110SBI was installed in August 2013;

4       **WHEREAS**, Defendants provided Plaintiff with a copy of the current SWPPP for the Facility

5  on May 23, 2014;

6       **WHEREAS**, on May 27, 2014, Plaintiff filed a complaint against Defendants, in the United

7  States District Court, Eastern District of California (Case No. 2:14-cv-01284-GEB-DAD) alleging

8  ongoing violations of the CWA (hereinafter "Complaint");

9       **WHEREAS**, Pick-N-Pull Auto Dismantlers, Pick and Pull Auto Dismantling, Inc., Norprop,

10  Inc., and Schnitzer Steel Industries, Inc., deny all allegations in the Notice Letter and Complaint, and

11  maintain that their operations are in compliance with the requirements of the CWA and the Storm Water

12  Permit;

13       **WHEREAS**, Plaintiff and Defendants have agreed that it is in the Settling Parties' mutual

14  interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the

15  allegations set forth in the Complaint without further proceedings and without any admission of liability

16  on the part of the Defendants; and

17       **WHEREAS**, all actions taken by Defendants pursuant to this Consent Decree shall be made in

18  compliance with all applicable Federal and State laws and local rules and regulations.

19       **NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING**
**PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**
20

21       1.       The Court has jurisdiction over the subject matter of this action pursuant to Section

22  505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A).

23       2.       Venue is appropriate in the Eastern District pursuant to Section 505(c)(1) of the Clean

24  Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is

25  located within this District.

26       3.       The Complaint states claims upon which, if true, relief may be granted pursuant to

27  Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

28       4.       Plaintiff has standing to bring this action.

5.      The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any pending motion to enforce this Consent Decree.

## I.      AGENCY REVIEW AND TERM OF CONSENT DECREE

6.      Plaintiff shall submit this Consent Decree to the United States Department of Justice ("DOJ") and the EPA (collectively "Federal Agencies") within four (4) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. In the event that the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time.

7.      The term "Effective Date" as used in this Consent Decree shall mean the last day for the Federal Agencies to comment on the Consent Decree, i.e., the forty-fifth (45th) day following the Federal Agencies' receipt of the Consent Decree, or the date on which the Federal Agencies provide notice that they require no further review, whichever occurs earlier.

8.      This Consent Decree will terminate two (2) years from the Effective Date, unless there is an ongoing, unresolved dispute regarding Defendants' compliance with this Consent Decree in which case the Consent Decree will terminate upon final resolution of the dispute.

## II.      COMMITMENTS OF THE SETTLING PARTIES

### A.      Storm Water Pollution Control Best Management Practices.

9.      In addition to maintaining the current structural and non-structural BMPs described in the Facility's SWPPP,[1] as noted below, Defendants shall develop and implement the additional BMPs identified herein, as well as any other BMPs necessary to comply with the provisions of this Consent Decree and the Storm Water Permit, including but not limited to developing and implementing BMPs that, collectively, are the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Treatment Technology ("BCT"), as well as those necessary to comply with the Storm Water Permit's Receiving Water Limitations.

10.      Facility-Wide BMPs.

---

[1] The current Facility SWPPP is attached hereto as Exhibit A, and contains the Facility map, which identifies the specific areas of the Facility referenced in this Consent Decree.

a.      Evacuation of Automobile Fluid(s). Except as set forth in subparagraph 11.a. below, Defendants agree that they will continue to drain all automobile fluid(s) in the covered vehicle Drain Building (identified on the Facility map).

b.      Use of Tarping or Other Temporary Covering. Defendants shall continue to inspect tarps and other temporary coverings that are used at the Facility to cover storage bins and other containers used for automobile parts storage to ensure that the tarps and coverings are in place, intact, in good condition and preventing the exposure of pollutant sources to precipitation. The inspections shall take place as part of daily housekeeping activities and before rain events. All tarps or other covers shall be repaired or replaced as necessary to prevent exposure of pollutant sources to precipitation.

c.      Vehicle Part(s) Storage. Defendants shall continue to inspect the Customer Yard for loose vehicle parts as part of its daily housekeeping activities. Loose vehicle part(s) that are discovered as part of daily housekeeping activities shall be placed inside vehicles, beneath vehicles, or in covered container(s), to prevent the exposure of pollutants to precipitation. Prior to and during rain events, Defendants shall focus their efforts on collection of loose parts that have the greatest potential to contribute pollutants to storm water, but shall not be in breach of this Consent Decree solely based on the discovery of loose vehicle parts in the Customer Yard as long as this provision is being complied with.

11.      The Hold Area/De-Garbage Area.

a.      Consistent with its current operating procedures, Defendants shall not remove any automotive fluid(s) from vehicles while they are located in the Hold Area/De-Garbage Area except windshield wiper fluid, refrigerants, power steering fluid and brake fluid, all of which must be evacuated by hand pump. Before draining of fluid(s) in the Hold Area/De-Garbage Area occurs, Defendants will continue to ensure that BMP(s) are being implemented to (1) prevent spillage of fluids onto gravel, and to (2) prevent releases of automotive fluids at the Hold Area/De-Garbage Area from flowing into drain inlets. Once fluids are evacuated, they shall be emptied into appropriate containers stored under cover within the designated storage areas of the Drain Building and Warehouse, consistent with current operating procedures.

b.      Defendants shall continue to prohibit the placement of any vehicle in the

Customer Yard that has not been drained of fluid(s).

        c.      Defendants shall continue to stage and maintain spill kits in the vicinity of the Hold Area/De-Garbage Area so they are readily available to employees engaged in the evacuation of fluids. The kits shall be labeled in both English and Spanish and shall contain absorbent pillows, oil pads, oil booms and other absorbent materials. Defendants shall continue to train employees engaged in the evacuation of fluids on the proper use of the kits.

        d.      Consistent with existing operational procedures at the Facility, no automobile dismantling or part(s) removal shall be conducted in the Hold Area/De-Garbage Area with the exception of removal of batteries, wheel weights, mercury switches, and wheel rims. No storage of loose vehicle part(s) shall occur in the Hold Area/De-Garbage Area. If rain is predicted, the engine compartment of any vehicle(s) that does not have a hood will be covered at the end of the operating day to prevent exposure of exposed vehicle part(s) to precipitation.

        e.      In the event the requirements for an Action Plan are triggered during the term of this Consent Decree (see Paragraph 19 below), Defendants shall consider the implementation of additional BMPs for the Hold Area/De-Garbage Area, such as paving, cover, or other BMPs to prevent the exposure of pollutant source(s) to precipitation. Defendants agree to include a discussion of these BMPs in the Action Plan, and why they are or are not to be developed and implemented to address pollutant level exceedances in discharges. Additional BMPs shall be implemented by the beginning of the next upcoming Wet Season[2] as set forth in Paragraph 20 below.

        12.    <u>Cleaning and Maintaining Impervious Surfaces.</u>

        a.      Cleaning: Defendants steam-cleaned the Crush Pad at the Facility in June 2014. Prior to October 1, 2015 and October 1, 2016, Defendants shall steam-clean the Crush Pad and other impervious surfaces at the Facility to remove the build-up of contaminants. In the event the requirements for an Action Plan are triggered during the term of this Consent Decree (see Paragraph 19 below), Defendants shall increase the frequency of steam-cleaning and/or propose additional BMPs to address pollutant level exceedances in discharges. While steam-cleaning, Defendants shall block Outfall #1 in order to prevent any non-storm water from discharging from the Facility.

---

[2] Defined as October 1 – May 31.

b.      Patching: After steam-cleaning impervious surfaces, Defendants shall patch, at a minimum, all cracks that are 1/4 inch or wider. In addition, as part of its regularly scheduled paving maintenance activities, Defendants shall repair concrete and other paved surfaces at the Facility by patching and/or replacing the surfaces.

c.      Sweeping: Within fifteen (15) days of the Effective Date, to the extent they have not already done so, Defendants shall develop and implement a plan to sweep all impervious ground surfaces at the Facility using a mechanical sweeper according to the following schedule: (1) at least once a week during the Wet Season, (2) at least twenty-four (24) hours prior to any precipitation event where more than 0.1 inches of rain is predicted in Rocklin with a minimum likelihood of occurrence of fifty-percent (50%) by the National Weather Service, and (3) at least once per month during the Dry Season.[3] Defendants shall keep a log of all sweeping done at the Facility.

13.     <u>Cleaning and Maintaining Gravel and Pervious Surfaces</u>. Defendants shall continue to implement their good housekeeping program and inspect the Facility for stained and or contaminated gravel, dirt, and build-up on other pervious surfaces. Defendants shall inspect the surfaces in the Customer Yard, Hold Area and De-Garbage Area on a daily basis, and shall continue to ensure the entire Facility is inspected at least weekly. Consistent with existing operational procedures at the Facility, all significantly stained and/or contaminated gravel shall be replaced upon inspection, except that significantly stained and/or contaminated gravel located underneath a vehicle shall be replaced after the vehicle row has been cleared.

14.     <u>Customer Access and Use of the Facility.</u>

a.      On-site Automobile Repair. Consistent with existing operational procedures at the Facility, Defendants shall continue to maintain signage in the Customer Parking Lot in English and Spanish, and implement other BMPs as necessary, to prohibit customers and other individuals from using any portion of the Customer Parking Lot for any automobile repair or dismantling activities. Defendants shall continue to maintain such signs including ensuring that the signage is kept in good condition.

b.      Within forty-five (45) days of the Effective Date, to the extent they have not

---

[3] Defined as June 1 – September 30.

already done so, Defendants shall post signage in English and Spanish in the Customer Yard directing customers to close hoods of vehicles after they have finished part(s) removal. Defendants shall maintain such signs including ensuring that the signage is kept in good condition.

        c.    Consistent with existing operational procedures at the Facility, to ensure that customers are complying with the signage, and that the BMPs are effective, Defendants shall continue to inspect the Customer Parking Lot at least once per day during operating hours and direct customers to cease any unauthorized automobile repair or dismantling activities in the Customer Parking Lot when such activity is observed.

        d.    Defendants shall continue to place drip pans, rugs, mats and/or scrap carpeting under each vehicle in the Customer Yard. Defendants shall continue to implement the Facility's procedures for the inspection, disposal, and replacement of all drip pans, rugs, mats and/or scrap carpeting to ensure that once they are unable to absorb additional fluid and contaminants they are properly disposed of and replaced.

        e.    During the Wet Season, Defendants shall continue to require Facility employees to close vehicle hoods as often as possible during operating hours. During the Dry Season, Defendants shall require Facility employees to close vehicle hoods as part of regularly scheduled cleaning activities. Defendants shall close vehicle hoods at least one (1) hour prior to the start of forecasted precipitation with a likelihood of occurrence of sixty-percent (60%) and shall, to the extent feasible, focus their efforts on maintaining vehicle hood closure during rain events.

    15.    <u>Crush Pad Area.</u> Defendants shall continue to ensure that no vehicle will be crushed unless the fluids have been evacuated and/or drained from it. This requirement shall not be interpreted to require the removal, prior to crushing, of vehicle engines, transmissions or other parts that contained fluids during the operating life of the vehicle, so long as the vehicles have been drained following Defendants' operational protocols and the terms of this Consent Decree. The Settling Parties acknowledge that it is impossible to remove one-hundred-percent (100%) of all automotive fluids from a vehicle and that small amounts of residual fluid may remain. Consistent with the Facility's existing BMPs, Defendants shall implement BMPs at the Crush Pad to ensure that any residual fluids released during the crushing process are cleaned up and removed, preventing their flow into drain inlets. These

BMPs shall be implemented in addition to the Facility's drain inlet protection BMPs.

16.   <u>Hazardous Material and Secondary Containment</u>. The current inventory, handling and management procedures for hazardous materials and hazardous wastes shall be detailed in the SWPPP. All such hazardous materials and hazardous wastes shall continue to be stored in designated "Hazardous Waste Storage Areas." Hazardous Waste Storage Areas shall be indoors and fully enclosed as stated in the SWPPP. Hazardous Waste Storage Areas shall have secondary containment for containers with 55 gallons or more of capacity, as required by applicable regulations, including 40 C.F.R. § 112.1(d). If outdoors, Hazardous Waste Storage Areas shall be protected from exposure to precipitation by roof cover and/or tarping.

**B.   Storm Water Drainage System.**

17.   <u>Discharge Locations and Storm Water Treatment.</u>

a.   Defendants have re-routed the storm water system at the Facility so that all storm water is directed through Jensen storm water interceptors and oil-water separators, which then flow to the StormwateRx Clara 40C for initial treatment and then to the StormwateRx Aquip 110SBI for additional treatment prior to discharge to Outfall #1, as identified on the attached Facility map (see Exhibit A). Defendants have also implemented additional BMPs, such as containment berms and grading, to ensure that storm water from the Facility is treated by the storm water systems described in this paragraph.

b.   Consistent with existing operational procedures, Defendants shall continue to utilize straw wattles, filters, and/or oil absorbents at each drain inlet at the Facility. Defendants shall continue to implement the Facility procedures for the inspection and maintenance of all drain inlet BMPs to ensure the drain inlet BMPs are in place, working as intended, and are being replaced as needed, and according to manufacturer's schedule. The BMP drain inlet inspections shall continue to occur on a regular basis during routine weekly inspections, and during and after each rain event.

c.   Defendants shall continue to annually inspect the perimeter of the Facility, and make any necessary repairs to ensure there are no storm water discharges from the Facility perimeter.

d.   Defendants shall continue to ensure the storm water drainage culvert, as identified on the map attached hereto, remains free of debris including vehicle parts and/or storage of vehicles.

e.      Defendants shall continue to operate and maintain the existing Jensen storm water interceptors, the oil-water separators, the StormwateRx Clara 40C and the StormwateRx Aquip 110SBI throughout the term of this Consent Decree.

f.      Defendants shall continue to inspect the Facility's storm water treatment systems and related treatment BMPs on a weekly basis, after significant storm events and remove from them any debris or other materials not related to the control and treatment of storm water (e.g., wood, metal, concrete and other debris).

**C.      Reduction of Pollutants in Discharges.**

18.      <u>Contaminant Reduction</u>. Defendants shall develop and implement BMPs to reduce pollutants in storm water discharges to levels below those in Table 1.[4] However, the presence of any contaminant in any discharge from the Facility in excess of the numeric values in Table 1 shall not be considered a breach of this Consent Decree provided Defendants have implemented BMPs that achieve BAT/BCT including, but not limited to, operation of the Jensen storm water interceptors, the oil-water separators, the StormwateRx Clara 40C and the StormwateRx 110SBI, and other BMPs identified in the Facility's SWPPP and in this Consent Decree.

**Table 1. Numeric Values for Facility Discharges**

| Contaminant | Value | Source of Value |
|---|---|---|
| Total Suspended Solids | 100 mg/L | 2008 EPA Benchmark |
| Total Recoverable Copper | **0.0156 mg/L** | 2008 EPA Benchmark |
| Total Recoverable Lead | **0.095 mg/L** | 2008 EPA Benchmark |
| Total Recoverable Zinc | **0.130 mg/** | 2008 EPA Benchmark |
| Oil and Grease | 15 mg/L | 2008 EPA Benchmark |
| Total Recoverable Aluminum | 0.750 mg/L | 2008 EPA Benchmark |
| Total Cadmium | **0.0023 mg/L** | 2008 EPA Benchmark |
| Total Recoverable Iron | 1.0 mg/L | 2008 EPA Benchmark |
| Total Recoverable Mercury | 0.0014 mg/L | 2008 EPA Benchmark |
| Biochemical Oxygen Demand | **30 mg/L** | 2008 EPA Benchmark |
| pH | 6.5-8.5 units | Basin Plan |

19.      <u>Action Plan for Table 1 Exceedances</u>. If the result(s) from any sampling event(s)

---

[4] Several of the values in the table are hardness dependent, as indicated in boldface type. Values based on 2008 EPA Benchmarks assume hardness of 101 mg/l CaCO$_3$.

conducted during a Wet Season reveals any contaminant at a concentration above the numeric value(s) specified in Table 1, Defendants shall submit a plan to Plaintiff for reducing the level of contaminant to, or below, Table 1 levels ("Action Plan"). An Action Plan shall be submitted by July 1 following the Wet Season during which the numeric value exceedance(s) occurs. Defendants shall only submit one Action Plan per Wet Season, if at all, for a maximum of two (2) Action Plans during the term of this Consent Decree. Nothing herein shall be construed as an admission by Defendants that the values in Table 1 must be achieved in order for the Facility to be in compliance with either the Storm Water Permit or the New Storm Water Permit.

20. <u>Action Plan Requirements</u>. Each Action Plan submitted shall include at a minimum: (1) the identification of the contaminant(s) discharged in excess of the numeric value(s); (2) an assessment of the source of each contaminant discharged in excess of the numeric value(s); (3) the identification of additional BMPs, including treating storm water prior to discharge from the Facility, that will reduce pollutant concentrations; and (4) time schedules for implementation of the proposed BMPs. The time schedule(s) for implementation shall ensure that all BMPs are implemented as soon as possible but at least by the beginning of the upcoming Wet Season (i.e., by October 1) unless the Settling Parties agree on a later date based on the time needed to design, procure, and install the necessary equipment. Any disputes over the deadline for implementation of additional BMPs identified in an Action Plan shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III below.

21. <u>Action Plan Review</u>. CSPA shall have thirty (30) days upon receipt of Defendants' Action Plan to provide Defendants with comments on the Action Plan. Defendants have thirty (30) days upon receipt of CSPA's comments on the Action Plan, to consider CSPA's comments, and shall either incorporate them into the Action Plan or, if Defendants decline to accept one or more of CSPA's comments, provide CSPA with a written explanation of the grounds for rejection on or before the end of the thirty (30) day period. Disputes regarding the adequacy of a particular BMP shall not impact the schedule for implementing any other BMP set forth in the Action Plan, except to the extent an undisputed BMP is related to a disputed BMP. Any disputes as to the adequacy of the Action Plan shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III

below.

22.     Defendants shall contact Plaintiff to request an extension of any deadline set forth in this Consent Decree, if necessary, to implement any structural BMPs requiring agency approval. Plaintiff's consent to Defendants' requested extension shall not be unreasonably withheld.

23.     Defendants shall revise their SWPPP and Monitoring & Reporting Plan ("M&RP") as applicable within thirty (30) days to reflect the changes required by an Action Plan. Defendants shall notify CSPA in writing when the Action Plan has been completely implemented.

**D.     Storm Water Sampling.**

24.     <u>Sampling</u>. During the life of this Consent Decree, Defendants agree to collect storm water samples from each location where storm water is discharged from the Facility from at least four (4) qualifying rain events per Wet Season. All sampling shall be conducted as described in subparagraphs a. through j.

a.     For purposes of this Consent Decree, a qualifying rain event is one that produces a discharge and is preceded by forty-eight (48) hours without a discharge.

b.     Defendants shall sample within four (4) hours of: (1) the start of discharge, or (2) the start of Facility operations if the qualifying rain event (as identified in (a), above) occurs within the previous twelve (12) hour period. Nothing herein shall be construed to require Defendants to collect storm water samples outside of the Facility's normal hours of operation.

c.     If, prior to March 1 of a Wet Season, Defendants have been unable to collect samples from two (2) qualifying rain events, Defendants shall satisfy the sampling requirements of this Consent Decree by sampling non-qualifying rain events, but shall still endeavor to collect samples from a qualifying rain event.

d.     Defendants agree to collect storm water samples from other discharge point(s) at the Facility that are created due to a change in operation or other circumstances, or are otherwise required to be sampled by the Storm Water Permit, the New Storm Water Permit, or this Consent Decree.

e.     Defendants shall analyze each storm water sample for the contaminants set forth in Table 1.

f.     A laboratory accredited by the State of California shall analyze all samples collected

1    pursuant to this Consent Decree.

2           g.    The laboratory shall use analytical methods adequate to detect the individual

3    contaminants at or below the values specified in Table 1.

4           h.    All samples collected from the Facility shall be delivered to the laboratory as

5    necessary to ensure that sample "hold time" is not exceeded.

6           i.    Defendants shall request that sample-analysis results be reported to it within ten (10)

7    business days of laboratory receipt of the sample.

8           j.    Defendants shall provide CSPA with the lab results, including a copy of the complete

9    laboratory report of all samples collected at the Facility, within five (5) business days of receiving the

10   results.

11   **E.    Visual Observations.**

12          25.    All BMPs shall be visually inspected at least weekly and after significant rain events. In

13   addition, all visual observations of storm water discharges shall be conducted in accordance with the

14   terms of the Storm Water Permit and this Consent Decree. During the life of this Consent Decree,

15   Defendants shall continue to conduct Daily Rain Checks at the Facility, documenting any rain events

16   that occur during working hours, including any associated discharge. Defendants shall maintain logs of

17   the Daily Rain Checks, which shall be included in Defendants' Annual Reports submitted to the

18   Regional Board, and within ten (10) days of receipt of Plaintiff's written request.

19   **F.    Employee Training.**

20          26.    Within sixty (60) days of the Effective Date, Defendants shall conduct additional

21   employee training in order to familiarize employees at the Facility as appropriate with the requirements

22   of the Storm Water Permit and this Consent Decree. The training program shall include use of written

23   training materials needed for effective implementation of the training program. Defendants shall also

24   ensure that there are a sufficient number of employees assigned to implement the BMPs and conduct

25   other compliance activities required by the Storm Water Permit and this Consent Decree, and that these

26   employees are properly trained to perform the required activities.

27          27.    The training program shall require at least the following:

28          a.    <u>Non-Storm Water Discharge Training</u>. The Defendants shall continue to train

1   employees, as appropriate to their particular job descriptions, on the Storm Water Permit's prohibition of

2   non-storm water discharges, so that employees know what non-storm water discharges are, which can

3   result from improper draining of automobile fluids, and how to detect and prevent them;

4          b.   <u>BMP Training</u>. The Defendants shall continue to train employees, as appropriate to

5   their particular job descriptions, on BMP implementation and maintenance to ensure that BMPs are

6   implemented effectively to prevent or minimize the exposure of pollutants to storm water, to prevent or

7   minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water

8   at the Facility;

9          c.   <u>Sampling Training</u>. The Defendants shall designate an adequate number of employees

10   to ensure the collection of storm water samples from each discharge location as required by this Consent

11   Decree and/or the Storm Water Permit. The training shall continue to include the proper sampling

12   protocols, including chain of custody requirements, to ensure storm water samples are properly

13   collected, stored, and submitted to a certified laboratory.

14          d.   <u>Visual Observation Training</u>. The Defendants shall provide training to all individuals

15   performing visual observations at the Facility pursuant to this Consent Decree and/or the Storm Water

16   Permit.

17      28.     Training shall continue to be provided on an annual basis, or as otherwise required to

18   ensure compliance with the terms of this Consent Decree, by a private consultant or a representative of

19   Defendants who is familiar with the requirements of this Consent Decree and the Storm Water Permit.

20   The training shall be repeated as necessary to ensure that employees are familiar with the requirements

21   of this Consent Decree, the Storm Water Permit, and the Facility's SWPPP and M&RP, as appropriate

22   to the particular employee's job descriptions. Any new employee who is responsible for implementation

23   of any portion of the SWPPP, the M&RP, or compliance with other terms of the Storm Water Permit or

24   Consent Decree shall receive training within thirty (30) days after being hired or before being

25   responsible for compliance with the terms of the Storm Water Permit or Consent Decree.

26      29.     The Defendants shall maintain training records to document compliance with Section II.F

27   of this Consent Decree, and shall make these records available for Plaintiff's review at the Facility. The

28   Training Program shall be specified in the SWPPP and Defendants shall modify the SWPPP as

1   necessary to reflect the training program required by this Consent Decree.

2   **G.      Storm Water Pollution Prevention and Monitoring and Reporting Plans.**

3          30.      Within sixty (60) days after the Effective Date of this Consent Decree, Defendants shall

4   further revise their SWPPP and their M&RP to the extent necessary to:

5                  a.    Include current BMPs;

6                  b.    Incorporate the requirements of the Storm Water Permit and this Consent Decree;

7                  c.    Incorporate BMPs identified and developed pursuant to this Consent Decree;

8                  d.    Include information contained in other documents that the SWPPP and/or M&RP refer

9   to, such as CADG documents, as appendices to the SWPPP and/or M&RP;

10                 e.    Identify the individuals responsible for compliance with the Storm Water Permit and

11  this Consent Decree including specifying which position or job description is responsible for what area

12  of compliance (e.g., Store Manager, collecting samples);

13                 f.    Include a site map that includes at a minimum current conditions at the Facility, and

14  all information required by the Storm Water Permit and this Consent Decree;

15                 g.    Identification of specific pollutant(s) associated with each industrial activity and/or

16  pollutant source, and BMPs for each potential pollutant source;

17                 h.    Description of specific maintenance of structural BMPs such as maintenance on the

18  filtration system, secondary containment, and berms.

19                 i.    Include, and modify as applicable, Defendants' visual inspection checklist that will be

20  used by trained Facility personnel when conducting the visual observations and monitoring of storm

21  water required under the Storm Water Permit and this Consent Decree.

22                 j.    Include the Storm Water Permit's sampling and monitoring requirements including

23  but not limited to the Facility's sample locations, and sample analysis for all applicable pollutants

24  including at a minimum those listed in Table 1.

25         31.      Commenting on the SWPPP and M&RP Revisions. Defendants shall submit the revised

26  SWPPP and M&RP to CSPA for review and comment as soon as it is completed but in any event no

27  later than sixty (60) days after the Effective Date. CSPA shall provide comments, if any, to Defendants

28  within thirty (30) days of receipt of the SWPPP and M&RP. Within thirty (30) days after receipt of

comments from CSPA, Defendants shall incorporate CSPA's comments into the SWPPP and M&RP or shall justify in writing why any comment is not incorporated. Any disputes over the adequacy of the revised SWPPP and M&RP shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III below.

32. <u>Additional Revisions to SWPPP and M&RP</u>. Defendants shall revise the SWPPP and M&RP if there are any changes in the Facility's operations that may possibly affect the quality of storm water discharges at the Facility, including but not limited to changes to storm water discharge point(s) or changes or additions to the BMPs at the Facility resulting from an Action Plan. Defendants shall submit any revised SWPPP and M&RP to CSPA for review and comment within five (5) days of completion. CSPA shall provide comments, if any, to Defendants within thirty (30) days of receipt of any revised SWPPP and M&RP. Within thirty (30) days of receiving comments from CSPA, Defendants shall incorporate CSPA's comments into any revised SWPPP and M&RP or shall justify in writing why any comment is not incorporated. Any disputes as to the adequacy of the SWPPP and M&RP shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section III below.

**H.   Compliance Monitoring and Reporting**

33. <u>Site Inspections</u>. Each year during the life of this Consent Decree, Plaintiff and its representatives may conduct up to two (2) site inspections at the Facility, plus an additional inspection if there is a dispute regarding compliance with the terms of this Consent Decree. The site inspections shall occur during normal business hours, and Plaintiff shall provide Defendants with three (3) business days advance notice of an intended inspection during the dry season, and at least forty-eight (48) hours advance notice for a Wet Season inspection. Plaintiff agrees that during inspections, Plaintiff's representatives will wear safety goggles, hard hats, ear plugs and vests, which will be provided by Defendants. Plaintiff also agrees to wear appropriate clothing and footwear, and remain in the presence of PNP representatives at all times. If Plaintiff seeks to enter a portion of the Facility that Defendants deem unsafe, the Settling Parties will discuss Defendants' concern in an attempt to resolve the concern so the inspection can continue. If the Settling Parties cannot resolve Defendants' concern, any disputes regarding the conduct of an inspection shall be resolved pursuant to the dispute resolution provisions of

this Consent Decree, set out in Section III below. In addition, if Plaintiff discloses any information to the public that was collected during the inspection, including observations, notes, analytical data or other information, all such information shall be shared with Defendants at the same time it is made available to the public.

34.     During the site inspection, Plaintiff and/or its representatives shall be allowed access to the Facility's SWPPP, M&RP, and other monitoring records, reports, and sampling data pertaining to storm water, and/or compliance with this Consent Decree, for the Facility. In addition, during the site inspection, Plaintiff and/or its representatives may collect samples of discharges from the Facility in the presence of Defendants or their representatives. Any samples collected by Plaintiff shall be submitted to a certified California laboratory for analysis in accordance with the provisions of Paragraph 24 of this Consent Decree. Copies of the complete laboratory reports shall be provided to Defendants within five (5) business days of receipt. At the request of Defendants, Plaintiff shall, if sufficient flow is available, provide Defendants with duplicate samples of any samples collected by Plaintiff, provided that nothing herein shall require Defendants to submit such samples for analysis. If Defendants request duplicate samples, they shall provide the necessary sample container(s) to Plaintiff for this purpose. If Defendants elect to analyze the duplicate samples, the analyses shall be conducted in accordance with the requirements of Paragraph 24, and a copy of the final laboratory report shall be provided to Plaintiff with five (5) business days of receipt of the results.

35.     Compliance Monitoring and Oversight. Defendants shall pay Plaintiff the sum of Four Thousand Dollars ($4,000.00) per year (totaling $8,000.00) during the term of the Consent Decree to help defray Plaintiff's costs of monitoring and overseeing Defendants' compliance with this Consent Decree. Payment of Four Thousand Dollars ($4,000.00) shall be made within ten (10) days after the Effective Date, and Four Thousand Dollars ($4,000.00) on the first anniversary of the Effective Date. Defendants' checks shall be made payable to: "Lawyers for Clean Water Attorney Client Trust Account" and shall be delivered by certified mail or overnight delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly Avenue, San Francisco, California 94129.

36.     Action Plan Payments. If Defendants are required to submit an Action Plan to CSPA in accordance with Paragraph 19, Defendants shall make Action Plan payments payable to: "Lawyers for

1   Clean Water Attorney Client Trust Account" and shall deliver such payments by certified mail or

2   overnight delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly Avenue, San Francisco,

3   California 94129 at the time the Action Plan is submitted to CSPA. The Action Plan payments shall be

4   made as follows:

5       a.    Limited Action Plan Payment. In circumstances where there are no more than two (2)

6   contaminants exceeding Table 1 numeric values in no more than a single rain event in a Wet Season,

7   and sampling was conducted as required by this Consent Decree and the Storm Water Permit,

8   Defendants shall make an additional initial compliance monitoring payment in the amount of Five

9   Hundred Dollars ($500.00) upon submission of the Action Plan. For example, if copper and zinc were

10  the only parameters exceeded for the entire Wet Season and were exceeded only once, then payment

11  under this subsection will be made. If zinc and copper were each exceeded in one sample event, and zinc

12  was exceeded during a second sample event, payment will be made under subsection b. below.

13      b.    Regular Action Plan Payment. In all other circumstances, Defendants shall make an

14  initial additional compliance monitoring payment in the amount of One Thousand Five Hundred Dollars

15  ($1,500.00) upon submission of the Action Plan.

16      c.    Thereafter, in the event that the initial payment is insufficient to cover the cost of CSPA's

17  review of the Action Plan, Defendants agree to reimburse CSPA its additional costs, up to a maximum

18  of One Thousand Five Hundred Dollars ($1,500.00), for a total Action Plan payment of Three Thousand

19  Dollars ($3,000.00) for any single Action Plan. Plaintiff shall submit an invoice to Defendants

20  documenting its additional costs, which shall be paid within thirty (30) days of receipt in accordance

21  with the provisions of this paragraph.

22      37.    <u>Reporting and Document Provision</u>. During the life of this Consent Decree, Defendants

23  shall copy Plaintiff on all documents related to water quality at the Facility that are submitted to the

24  Regional Board, the State Board, and/or any State or local agency or municipality. Such reports and

25  documents shall be provided to Plaintiff concurrently as they are sent to the agencies and/or

26  municipalities. Any correspondence related to Defendants' compliance with the Storm Water Permit or

27  storm water quality received by Defendants from any regulatory agency, State or local agency, county or

28  municipality shall be provided to CSPA within five (5) business days of receipt by Defendants.

## I.    Environmental Project, Litigation Fees and Costs, and Stipulated Penalties

38.    <u>Environmental Mitigation Project</u>. To remediate environmental harms as alleged in the Complaint, Defendants shall pay Thirty Five Thousand Dollars ($35,000.00) to be used to fund environmental project activities that will benefit the Sacramento River watershed, and, to the extent possible, with an emphasis on its tributaries such as Antelope Creek ("the Mitigation Payment"). The Mitigation Payment shall be paid to the Rose Foundation for Communities and the Environment, 6008 College Avenue, Suite 10, Oakland, California 94618 attention Tim Little. The Mitigation Payment shall be made within sixty (60) days of the Effective Date of this Consent Decree, and Defendants shall concurrently provide Plaintiff with a copy of such payment. Plaintiff shall coordinate with the Rose Foundation to provide DOJ with the information set out in Paragraph 5 of the Notification on Receipt of a Clean Air Act or Clean Water Act Citizen Suit Complaint ("Notification") (DOJ, Environment and Natural Resources Division, February 2012), attached hereto as Exhibit B. Plaintiff shall inform the Rose Foundation that it is required to copy Defendants on any reporting to DOJ regarding the disbursement of the Mitigation Payment. No portion of the Mitigation Payment may be made to Plaintiff.

39.    <u>CSPA's Fees and Costs</u>. Defendants agree to reimburse CSPA for its investigation fees and costs, expert/consultant fees and costs, reasonable attorneys' fees, and other costs incurred as a result of investigating and preparing this lawsuit, and negotiating a resolution of this matter, in an amount totaling Sixty-Six Thousand Five Hundred Dollars ($66,500.00), which amount shall be paid in full for Lawyers for Clean Water's fees and costs, and any experts that were retained in connection with this matter. Such payment shall be made within thirty (30) days of the Effective Date, payable to: "Lawyers for Clean Water Attorney Client Trust Account" and delivered by certified mail or overnight delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly Avenue, San Francisco, California 94129.

40.    <u>Stipulated Payment</u>. The Defendants shall make a stipulated payment of One Thousand Dollars ($1,000.00) for each missed deadline included in this Consent Decree. Payments for a missed deadline shall be made to fund environmental project activities that will benefit the Rocklin-San Joaquin River Delta and its watershed and shall be made to the Rose Foundation to the address listed above. The Defendants agree to make the stipulated payment within thirty (30) days of a missed deadline.

1    Defendants shall provide Plaintiff with a copy of each such payment at the time it is made.

2        41.    <u>Interest Payments</u>. In the event of late payment of any of the sums due to Plaintiff under

3    this Consent Decree, the Defendants shall pay ten-percent (10%) APR interest to Plaintiff, which shall

4    accrue from the first day past the date the sum was due until the date the Defendants tender payment. All

5    such payments shall be made payable to: "Lawyers for Clean Water Attorney Client Trust Account" and

6    delivered by certified mail or overnight delivery to: Lawyers for Clean Water, Inc., 1004-A O'Reilly

7    Avenue, San Francisco, California 94129.

8    **III.    <u>DISPUTE RESOLUTION</u>**

9        42.    This Court shall retain jurisdiction over this matter until the Consent Decree terminates in

10   accordance with Paragraph 8 for the purposes of implementing and enforcing the terms and conditions

11   of this Consent Decree, and adjudicating all disputes among the Settling Parties that may arise under the

12   provisions of this Consent Decree. The Court shall have the power to enforce this Consent Decree with

13   all available legal and equitable remedies, including contempt.

14       43.    <u>Meet and Confer</u>. A Settling Party to this Consent Decree shall invoke the dispute

15   resolution procedures of this Section by notifying all other Settling Parties in writing of the matter(s) in

16   dispute. The Settling Parties shall then meet and confer in good faith (either telephonically or in person)

17   in an attempt to resolve the dispute informally over a period of twenty (20) calendar days from the date

18   of the notice.

19       44.    If the Settling Parties cannot resolve a dispute by the end of meet and confer informal

20   negotiations, the party initiating the dispute resolution provision may invoke formal dispute resolution

21   by filing a motion before the United States District Court for the Eastern District of California. The

22   Settling Parties agree not to object to an expedited hearing schedule on the motion if one of the Settling

23   Parties requests one.

24       45.    <u>Burden of Proof</u>. In the event of any disagreement or dispute between Plaintiff and

25   Defendants over the necessity or appropriateness of implementing any particular BMP or set of BMPs,

26   including in any formal or informal proceeding brought to enforce the terms of this Consent Decree,

27   Defendants shall bear the burden of demonstrating that its BMPs, collectively, constitute BAT/BCT for

28   the Facility, or that they are in compliance with the terms of this Consent Decree. Plaintiff shall not be

1   required to prove that Defendants' BMPs do not constitute BAT/BCT.

2        46.    Litigation costs and fees incurred in conducting meet and confer or otherwise addressing

3   and/or resolving any dispute, including an alleged breach of this Consent Decree, shall be awarded in

4   accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. § 1365, and case

5   law interpreting that standard.

6   **IV.**    **MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE**

7        47.    <u>CSPA's Release</u>. Upon the Effective Date of this Consent Decree, CSPA, on its own

8   behalf and on behalf of its current and former officers, directors, employees, subsidiaries, and affiliates,

9   and each of their successors and assigns, and its agents, attorneys, and other representatives releases all

10   persons including, without limitation, Defendants and each of their current and former officers,

11   directors, members, employees, shareholders and each of their predecessors, successors and assigns, and

12   each of their agents, attorneys, consultants, and other representatives from, and waives all claims which

13   arise from or pertain to this action, including all claims for injunctive relief, damages, penalties, fines,

14   sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other

15   sum incurred or claimed, and/or claims that were asserted in CSPA's Notice Letter and Complaint up to

16   the Effective Date.

17        48.    <u>Defendants' Release</u>. Upon the Effective Date of this Consent Decree, Defendants, on

18   each of their own behalves and on behalf of their current and former officers, directors, employees,

19   members, and each of their successors and assigns, and their agents, attorneys, and other representatives

20   releases CSPA (and its current and former officers, directors, employees, members, parents, subsidiaries,

21   and affiliates, and each of their successors and assigns, and its agents, attorneys, and other

22   representatives) from, and waives all claims which arise from or pertain to this action, including all

23   claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum

24   incurred or claimed or which could have been claimed for matters associated with or related to CSPA's

25   Notice Letter and Complaint up to the Effective Date.

26        49.    Nothing in this Consent Decree limits or otherwise affects CSPA's right to address or

27   take any position that it deems necessary or appropriate in any formal or informal proceeding before the

28   Regional Board, EPA, or any other judicial or administrative body on any other matter relating to storm

water discharges from the Facility occurring or arising after the Effective Date of the Consent Decree but specifically excluding the discharges and all other matters addressed by this Consent Decree.

## V.   MISCELLANEOUS PROVISIONS

50.   No Admission of Liability. Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Defendants maintain and reserve all defenses they may have to any alleged violations that may be raised in the future.

51.   Force Majeure. Force Majeure includes any act of God, war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism, sabotage or terrorism; restraint by court order or public authority or agency; or action or non-action by, or inability to obtain the necessary authorizations or approvals from any governmental agency. Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay. Any Settling Party seeking to rely upon this paragraph to excuse or postpone performance, shall have the burden of establishing that it could not reasonably have been expected to avoid the force majeure event and which by exercise of due diligence has been unable to overcome the failure of performance. The Settling Parties shall exercise due diligence to resolve and remove any force majeure event.

52.   Construction. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

53.   Choice of Law. The laws of the United States shall govern this Consent Decree.

54.   Severability. In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

55.   Correspondence. All notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by overnight mail or courier or by electronic mail, with request for confirmation receipt, as follows:

If to Plaintiff:

Layne Friedrich
         Layne@lawyersforcleanwater.com
Drevet Hunt
         Drev@lawyersforcleanwater.com
Lawyers for Clean Water, Inc.
1004-A O'Reilly Avenue
San Francisco, California 94129

With copies to:

Bill Jennings, Executive Director
         Deltakeep@me.com
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, California 95204

If to Defendants:

Margaret Rosegay
         margaret.rosegay@pillsburylaw.com
Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111

With copies to:

Charina Gaspay
         cgaspay@picknpull.com
Pick-n-Pull EHS Department
10850 Gold Center Drive, Suite 325
Rancho Cordova, California 95670

Michael Brinkley
         mbrinkley@picknpull.com
Pick-N-Pull Auto Dismantlers
10850 Gold Center Drive, Suite 325
Rancho Cordova, California 95670

Notifications of communications shall be deemed submitted the next business day after having been deposited with an overnight mail/delivery service. Any change of address or addresses shall be communicated in the manner described above for giving notices. In addition, the Settling Parties may agree to transmit documents electronically or by facsimile.

56.     Effect of Consent Decree. Except as provided herein, Plaintiff does not, by its consent to this Consent Decree, warrant or aver in any manner that Defendants' compliance with this Consent Decree will constitute or result in compliance with any Federal or State law or regulation. Nothing in this Consent Decree shall be construed to affect or limit in any way the obligation of Defendants to

1    comply with all Federal, State, and local laws and regulations governing any activity required by this

2    Consent Decree.

3         57.    <u>Counterparts</u>. This Consent Decree may be executed in any number of counterparts, all of

4    which together shall constitute one original document. Telecopy, email of a .pdf signature and/or

5    facsimile copies of original signature shall be deemed to be originally executed counterparts of this

6    Consent Decree.

7         58.    <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein,

8    may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the

9    Settling Parties.

10        59.    <u>Dismissal of Schnitzer Steel Industries, Inc</u>. Following entry of this Consent Decree by

11   this Court, Schnitzer Steel Industries, Inc. shall be dismissed from this litigation with prejudice, and

12   shall not be considered a Settling Party or otherwise bound by the terms of this Consent Decree.

13        60.    <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

14        61.    <u>Integration Clause</u>. This is an integrated Consent Decree. This Consent Decree is

15   intended to be a full and complete statement of the terms of the agreement between the Settling Parties

16   and expressly supersedes any and all prior oral or written agreements covenants, representations, and

17   warranties (express or implied) concerning the subject matter of this Consent Decree.

18        62.    <u>Authority</u>. The undersigned representatives for Plaintiff and Defendants each certify that

19   he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of

20   this Consent Decree.

21        63.    The provisions of this Consent Decree apply to and bind the Settling Parties, including

22   any successors or assigns. The Settling Parties certify that their undersigned representatives are fully

23   authorized to enter into this Consent Decree, to execute it on behalf of the Settling Parties, and to legally

24   bind the Settling Parties to its terms.

25        64.    The Settling Parties agree to be bound by this Consent Decree and not to contest its

26   validity in any subsequent proceeding to implement or enforce its terms. By entering into this Consent

27   Decree, the Defendants do not admit liability for any purpose as to any allegation or matter arising out

28   of this Action.

1        IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first

2   set forth above.

    **IT IS SO ORDERED:**

3

4   **Dated:  November 25, 2014**

5

6   _____

7   GARLAND E. BURRELL, JR.
    Senior United States District Judge

8   APPROVED AS TO FORM            LAWYERS FOR CLEAN WATER, INC.

9

10  Dated: _____2014        By: _____

11                                  Layne Friedrich
                                    Attorney for Plaintiff

12                                  PILLSBURY WINTHROP SHAW PITTMAN LLP

13

14  Dated: _____2014        By: _____

15                                  Margaret Rosegay
                                    Attorney for Defendants

16  APPROVED AS TO CONTENT

17

18  Dated: _____2014        By: _____

19                                  Bill Jennings
                                    California Sportfishing Protection Alliance

20

21

22  Dated: _____2014        By: _____

                                    Michael Brinkley
23                                  Pick and Pull Auto Dismantling, Inc.

24

25  Dated: _____2014        By: _____

                                    Michael Brinkley
26                                  Norprop, Inc.

27

28  Dated: _____2014        By: _____

                                    Michael Brinkley

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pick-N-Pull Auto Dismantlers